## Scott's Estate.

*Executors and administrators — Testamentary direction to incorporate business—Fiduciaries Act of June 7, 1917.*

Testator, who owned a valuable printing business, directed his executors to incorporate the business, and authorized them if, for any reason, it became impracticable to incorporate, to continue his capital in the business as a loan, special partnership or otherwise. He further provided that the stock of the corporation should be distributed to his residuary legatees, and that, on receiving such stock, and as a condition of so receiving it, they should enter into a stockholders' agreement that if any stockholder desired to sell or died, the remaining stockholders, or such of them as might desire so to do, should have the right, within sixty days after such resignation or death, to purchase the stock at its then book value, less 10 per cent., and the stock should not be sold or transferred except subject to such agreement. The executors, to avoid the excess profits tax, conducted the business under the old name under the Fictitious Names Act of June 28, 1917, P. L. 645, for about two years. They then incorporated the business. A daughter, one of the residuary legatees, died meanwhile, and her executor refused to accept the stock when tendered to him by the executors, contending that the will required an immediate incorporation; that the executors had definitely decided not to incorporate; and that his testatrix was, therefore, entitled to one-sixth of the general estate as residuary legatee. On the audit of the executors' account, the deceased legatee's executor made the above claim. The auditing judge held: 1. That section 43 of the Fiduciaries Act of June 7, 1917, P. L. 447, did not apply, as the incorporation was directed by the will; hence the executors had the right to incorporate without applying to the Orphans' Court. 2. As a matter of fact, the executors had not decided not to incorporate, and no inference that they had so decided would be drawn from the postponement of incorporation under the circumsatnces. 3. That the residuary legatee's rights were not affected by the fact that the corporation was not organized until after her death. 4. That the stock should be awarded to her executor, subject to the conditions imposed. On exceptions: *Held*, no error.

Exceptions to adjudication. O. C. Phila. Co., Jan. T., 1923, No. 428.

The auditing judge, Gest, J., said in his adjudication:

"William H. Scott died on April 12, 1920, a widower, leaving a will, admitted to probate on April 19, 1920, when letters testamentary were granted. . . .

"By his will, dated Nov. 10, 1916, the testator directed the payment of his debts and that no inventory or account be filed, provided for the deduction from the shares of his children of any indebtedness due by them, gave certain directions as to the proceeds of insurance policies, if payable to certain named beneficiaries who were also entitled to take under the will, and devised to the

3 D. & C.

executors No. 108 Schoolhouse Lane and his summer home at Spring Lake, New Jersey, etc., for sale and until sale for the occupancy thereof by such of his children and their families as might desire to so occupy them. The testator then provided in the sixth and seventh clauses of his will as follows:

" 'Sixth. It is my desire that the business now carried on under the name of Allen, Lane and Scott shall be continued for the benefit of my descendants, but in such way if possible as will not interfere with the immediate settlement and distribution of my estate. For this purpose I direct that my executors shall cause a corporation to be incorporated under the name of Allen, Lane and Scott, or as near that name as possible, and that my executors shall transfer to such corporation in return for $500,000 at par value of its stock the stock, good-will, fixtures and assets of said business, subject to its liabilities, which liabilities are to be paid out of the assets of said business. I direct that there shall be included as part of the assets of said business the real estate on Clover Street and Sansom Street, Philadelphia, now used in connection therewith. The stock of said corporation is then to be distributed in kind as part of my residuary estate, giving to the distributees the same proportions as they would be entitled to if it was cash, subject always to the adjustments made necessary by considering the life insurance as part of my residuary estate for purposes of distribution under the fourth paragraph of this will. I also desire that each distributee who received stock shall, as a condition of so receiving it, transfer to John C. McKinney, if he is willing to enter into the employ of the corporation, 2 per cent. in par value of the stock so received by such distributee in order to insure an interest on the part of said John C. McKinney in the business of the corporation. I also direct that all of distributees receiving stock shall, as a condition of receiving said stock, enter into a stockholders' agreement to be entered on the minutes and filed with the Secretary and notice thereof stamped upon every certificate of stock, which agreement shall provide that if any stockholder desires to sell or dies, or if any stockholder not being one of my children shall, being an officer or employee of the corporation, resign or be removed from such office, or employment, the remaining stockholders or such of them as may desire so to do shall have the right within sixty days after notice of such desire to sell, or within sixty days after such resignation, removal or death, to purchase said stock at its then book value less 10 per cent., and that said stock shall not be sold or transferred except subject to said agreement, which provision shall apply to assignees or transferees of said stock, including said John C. McKinney. If any one of the distributees of my estate prefers in the distribution of my estate to take cash instead of the par value of said stock and my executors think it for the best interest of my estate to pay such cash in lieu of stock, they are authorized and empowered in their discretion to do so and distribute the stock among the other distributees. It is my desire also that my son William P. Scott, who is at present connected with the business, shall be elected by said corporation or its directors an officer and employee having charge of the active management of the business at an adequate salary. In case it should become impracticable for any reason to form said corporation, I authorize my executors to make any other arrangement they may think best for continuing my capital in the business either as a loan or in a special partnership or otherwise, but I prefer the corporation plan and only give this power in order to provide for the case of that proving impossible or specially undesirable for some reason.

" 'As the net assets of the said business may change between the making of this will and the time of my death, I authorize my executors at their discre-

Scott's Estate.

tion to increase or diminish the amount of stock to be issued at par value in return for the business, so that such stock may bear about the same proportion of the book value of those assets as the sum of Five hundred thousand Dollars named by me bears to the present book value of those assets, this however to be purely discretionary with my executors.

" 'Seventh. Subject to the directions and conditions embodied in this will and the powers herein given to my executors, I give, devise and bequeath all the rest, residue and remainder of my estate to my six children, William P. Scott, John W. Scott, Martha S. Wells, wife of Dr. G. Harlan Wells, Garfield Scott, Helen P. Scott and Dorothy S. Webster, wife of Maurice A. Webster, in equal shares. Provided however that if any of my children should die before me leaving surviving at my death no husband or wife or descendants, then the share above given to such child shall lapse and be added in equal shares to the shares hereinabove given to my other children. But should any of my children die before me and leave surviving at my death either husband or wife or descendants or both husband or wife and descendants, then the share of such child shall vest in such persons as would be entitled to the same under the Intestate Laws of Pennsylvania had such child survived me and died intestate seised of such share.

" 'And provided further that in the case of any child so dying before me and leaving surviving at my death a husband or wife or descendants or both husband or wife and descendants, then any share of the stock of the corporation which I have directed should be formed to carry on the business now carried on under the name of Allen, Lane and Scott, which may be distributed to the distributees under the Intestate Laws of such child under the foregoing provisions of this will shall be taken subject to a right of the other holders of stock in such corporation or such as may desire so to do to purchase the said stock within sixty days after such distribution at its book value less 10 per cent., my object being to put the other holders of said stock in the same position with regard to the right to purchase as if such child had survived me, received the stock and then died.'

"The testator in the eighth clause of his will authorized his executors to sell his real estate; in the ninth clause gave directions for the partition of his cemetery lot in West Laurel Hill Cemetery, and in the tenth clause appointed William P. Scott and Garfield Scott as his executors to serve without commissions.

"The testator left surviving him six children, three sons, William P., Garfield and John W. Scott, and three daughters, Martha S. Wells, Helen P. Scott and Dorothy S. Webster, all of age, of whom Martha S. Wells subsequently died on July 19, 1922, leaving a will, dated Feb. 14, 1917, admitted to probate on July 31, 1922, by which she gave her entire estate to her husband, George Harlan Wells, and appointed him executor. . . .

"Messrs. Saul and Remick, in behalf of G. Harlan Wells, executor of Martha S. Wells, deceased, claimed one-sixth of the original net estate of the decedent, and this requires the court to consider paragraphs six and seven of the will above quoted and the acts of the executors in connection with the incorporation of Allen, Lane & Scott and the distribution of the stock thereof.

"The testator, at the time of making his will and at his death, conducted a printing business under the name of Allen, Lane & Scott, of which he was the sole owner, and by his will directed his executors to cause the same to be incorporated and to transfer the stock, good-will, fixtures and assets of the business, including certain real estate, to the corporation in exchange for its stock, capitalized at $500,000, which he directed should be distributed in kind

3 D. & C.

to his six children, imposing, however, two conditions: First, that each distributee should transfer 2 per cent. of the stock to John C. McKinney, an old employee; and, second, that the distributees should enter into a stockholders' agreement, to be entered on the minutes and filed with the secretary, and notice thereof to be stamped upon every certificate of stock, providing that if any stockholder desires to sell or dies, or if any stockholder, not one of testator's children, shall, being an officer or employee of the corporation, resign or be removed from such office or employment, the remaining stockholders, or such of them as may desire so to do, shall have the right, within sixty days after notice of such desire to sell, or, within sixty days after such resignation, removal or death, to purchase said stock at its then book value, less 10 per cent., and that said stock shall not be sold or transferred except subject to said agreement, which provision shall apply to assignees or transferees of said stock, including John C. McKinney. The will contains certain other provisions which will be noticed in the course of this adjudication.

"The application for the charter was made on Aug. 17, 1922, which was subsequent to the death of Mrs. Wells. The charter was granted on Sept. 5, 1922, and recorded Sept. 6, 1922. The capital was first fixed at $5000, and was, on Sept. 6, 1922, afterwards increased to $500,000. On the latter date the assets of the business of Allen, Lane & Scott were transferred to the corporation of the same name, and stock to the amount of $500,000 was issued therefor. On Sept. 14, 1922, the executors tendered to the executor of Martha S. Wells, for his signature, a stockholders' agreement, dated Sept. 6, 1922, signed by the five surviving children and John C. McKinney, and also certificates for 816⅔ shares of stock and for 16⅔ shares, the certificates for the latter 16⅔ shares representing the 2 per cent. transferable to John C. McKinney, who died in the service of the company on Dec. 31, 1922. These tenders were made in two letters, dated Sept. 14, 1922, addressed to Messrs. Saul, Ewing, Remick & Saul, as counsel for the estate of Martha S. Wells, by Messrs. Middleton, Blakeley & Richardson, as counsel for the executors and the surviving children, and the writers stated that their clients desired to exercise their right to purchase the said 816⅔ shares of stock at the price stated in the stockholders' agreement, viz., at its book value, less 10 per cent. These tenders were refused, thus raising the important questions for decision.

"It was asserted, on behalf of the estate of Martha S. Wells, that the creation of the corporation was void, because the executors did not proceed under section 42 of the Fiduciaries Act and obtain the authority of the Orphans' Court. While neither this act nor the former Act of April 22, 1889, P. L. 42, 4 Purd., 4928, appear to have been considered in any decision of our courts, the answer is clear enough. Irrespective of statute or of some power conferred by will, an executor has no authority to continue the business of his testator, and does so at his own risk, and even where he is authorized or directed to carry on the business, there is always danger of his incurring personal liability. He would likewise have no right to incorporate the business and turn over the assets in exchange for stock, any more than he would have a right to invest in the corporate stock of another company. But every testator has the general right, subject to limitations that do not concern us here, to direct the management and investment of his estate, and his executor is, therefore, clothed not merely with the power, but also with the duty of carrying out such direction: Furst v. Armstrong, 202 Pa. 348; and just as a testator may direct his executor to invest the moneys of his estate in stocks or other form of security, so he has the right to direct his executor to transfer the assets of his estate to a corporation organized to carry on his business

and to accept the stock of the company as their equivalent. The Act of 1889 was framed to provide for a case where the will authorized or directed executors or trustees to carry on or continue the testator's business, so that they might do so without hazard, and provided for the protection of the parties interested under the will. The Fiduciaries Act extended this wholesome provision of the Act of 1889 to cases of administration where there is no will, and of testacy where the will contained no authority. But this act, like that of 1889, is distinctly remedial in its nature, and intended to supply, through the supervision and authority of the court, that protection to a fiduciary which the testator had omitted to provide. Where the will contains, as it does in this case, ample authority and direction to incorporate, there is no more need for invoking the authority of the court than there would be for an executor or trustee, who is directed to sell land, to come into court and ask for authority to do so.

"It was, however, argued that the whole scheme of the testator's will proceeded on the theory that this corporation would be formed to take over the testator's business immediately on his decease, unless the executors deemed this course impracticable, or, to use the subsequent phraseology of the testator, impossible or specially undesirable, in which case he authorized them to make any other arrangement they might think best for continuing his capital in the business, either as a loan or in a special partnership or otherwise, and that their acts, as disclosed by the testimony, conclusively show that they did deem the incorporation impracticable. The intent of the testator, it was argued, was, therefore, frustrated by the acts of the executors, because at Mrs. Wells's death there was no corporation; Mrs. Wells was not a stockholder, nor subject to the terms of the stockholders' agreement, and there were no other stockholders existing and capable of purchasing the stock which she did not own in a non-existent corporation.

"The first question, therefore, is one of fact. Did the executors conclude that it was impracticable to incorporate the business? The testimony shows' that when the testator died, and for some time thereafter, the Federal system of income taxation included what is known as the excess profits tax, and the executors were advised by their counsel, by letter (page 56 of the testimony), that the taxes which would become payable by the corporation, if then formed, would be extremely onerous, and, as it was considered probable the Congress would repeal or modify the law, it was deemed advisable to await the event. Meantime, a certificate was filed in the office of the Secretary of the Commonwealth by the executors, under the Act of June 28, 1917, P. L. 645 (generally known as the Fictitious Names Act), and in the prothonotary's office, certifying that the business was carried on by the executors under the name of Allen, Lane & Scott, and the secretary issued his certificate accordingly. The executors continued to run the business under said name, distributed the profits and made their income tax return accordingly under Form 1040, as of an estate in process of administration, this method undoubtedly saving a large amount of tax, as the profits were divided among the six beneficiaries and the surtax rate was lower than it would otherwise have been. The excess profits law was repealed in November, 1921, the repealer going into effect on Jan. 1, 1922, and the books of the business were closed as of June 30, 1922, as a preliminary to the formation of the corporation, the charter of which was granted on Sept. 5, 1922. I can discover nothing substantial in the testimony to show that the executors ever resolved not to incorporate or stated such intention to any one concerned, and in their testimony they denied that this was the fact. The will indicates a positive intention on the part of the

3 D. & C.

testator that the business should be incorporated, and there is nothing in the will to indicate that the incorporation must be effected within any certain period. In my opinion, the executors had a right to postpone the actual incorporation for a time until the unfavorable conditions were removed, and there can be no question that their delay was induced solely by the danger of excessive taxation and from a laudable desire to avoid it, and there is nothing to show that Mrs. Wells in her lifetime objected to the delay. Their action, taken under the advice of counsel, was prudent, and doubtless resulted in saving the payment of unnecessary taxes. The delay was no more inconsistent with the direction of the will than that which occurs so frequently where a testator directs his executor to convert the real estate and the executor, in order to obtain higher prices, waits for a better market, and thus enhances the value of the estate, while in the present case the delay preserved it from loss.

There is no substantial ground for the argument that the power to incorporate was exhausted. On the contrary, the will directed it, and the executors had only a discretionary power to continue the interest of the testator in some other form if incorporation should be impracticable. But it was not impracticable or impossible, and the power being given without limitation of time, its duration must be measured by reference to its purpose, and this clearly appears from the will, which shows that the testator contemplated that the corporation might not be organized within the usual time for the settlement of his estate. This incorporation was specially desired by the testator, and his will should not be frustrated by a merely temporary postponement which was in itself judicious.

"The chief ground, however, upon which the argument was based was that the intervening death of Mrs. Wells made it impractical to carry out the testator's intention and inequitable to Mrs. Wells's interest.

"George Harlan Wells, who was the husband and executor of Martha Scott Wells and legatee of her estate, testified that, after his wife's death, he had an interview with Garfield Scott on July 27, 1922, in which the latter said that the other beneficiaries under the will had the option of taking over Mrs. Wells's share in the estate (probably meaning the business) at the approximate sum of $85,000 or $90,000; that no corporation had been formed; that they had decided not to form a corporation because of Government taxation, and that if he did not accept the offer, they proposed to form a corporation and to offer to purchase Mrs. Wells's stock. Garfield Scott testified that the conversation had reference to the intention of the testator as diclosed in his will, the witness maintaining that it was his father's intention that the surviving children should have the right to purchase the interest of a deceased child, which was denied by George Harlan Wells and his brother, Edward Webster Wells, who was present at the conversation, upon which George Harlan Wells said it was a matter for the courts to decide as to what was the testator's intention, the witness stating that he was willing to leave it to the court's decision, and there was some conversation about the incorporation of the business, but most of the discussion was on the intention of the will. Garfield Scott at the interview stated that the surviving children could purchase Mrs. Wells's interest, and denied that at the interview he had stated that the executors had decided at any time not to incorporate.

"As I have stated, I do not find any tangible evidence that the executors indicated any conclusion not to incorporate in accordance with the direction of the will. This conversation that took place between Garfield Scott, on the one side, and Dr. Wells and his brother, on the other, which occurred before the repeal of the excess profits tax, amounted to this, that the executors had

not incorporated because of the excess profits tax, and that the other children of the testator proposed to assert their right under the will to buy Mrs. Wells's interest in the business, which right depended on the construction of the will, and was denied by the Messrs. Wells. I fail to see any just ground for the proposition that the right, and it may be said the duty, of the executors to incorporate was in any manner affected by the death of Mrs. Wells, and I think this clearly appears from a consideration of the testator's directions. In the first place, he was evidently desirous and intended that his business, in which he took a pardonable pride, should be continued after his death in the permanent form of a corporation, and the stock in this corporation, as included in his residuary estate, he gave to his six children, providing that if any distributee should die, the remaining stockholders should have the right to purchase the stock at its then book value, less 10 per cent., and providing that if any should predecease him, leaving husband, wife or descendants, the share of such child should vest in such persons as would be entitled to the same under the intestate laws had such child survived and died intestate, and that the distributees of stock should take subject to the condition specified, and there does not appear any intention that a child who survived him could, as a matter of right, retain and transfer the stock to his or her descendants. The benefit contemplated in the interest of the child was, therefore, stock ownership during his or her life only, and the exchange of that stock for cash at the price fixed on the child's death at the election of the remaining stockholders; and in clause seven of the will, in providing for the case of a child who predeceased him, he also provides that the share of the stockholder which otherwise would have remained to that child could be purchased by the other children at its book value, less 10 per cent., his object being, as is stated, to put the other holders of the stock in the same position with regard to the right to purchase as if such child had survived him, received the stock and then died.

"I cannot see, in view of these provisions, that the rights of Mrs. Wells's estate are in any manner affected by the fact that the corporation was not organized until after her death. Had the executors, immediately after the testator's death, taken steps to incorporate, and Mrs. Wells had died in the meantime, before the charter was granted, it could hardly be supposed that the other children would not have had the right to buy the shares of stock to which she would have been entitled at the book value, less 10 per cent., and I do not see that it makes any difference that, for the reasons stated, the executors did not incorporate until after her death. Her executor simply succeeded to her rights, namely, to receive her one-sixth share of the stock, subject, however, to the condition as to the assignment of 2 per cent. to John C. McKinney and to the sale of the other 98 per cent. to the other children at the prescribed valuation, which is precisely the purpose the testator had in mind in the case of the death of any of his children. The exercise of the power merely changed the form of the property bequeathed into stock, and subjected it to these two conditions, which were not personal to Mrs. Wells and can be complied with by her executor as well as by herself. The benefit intended by the testator for Mrs. Wells was just exactly the same in one case as in the other. The right of purchase given by the testator, in case of the death of one of his children, to the surviving children was clearly an essential part of the testamentary scheme, for he evidently intended the stock to be held by his living children and gave them a preferential right to acquire it.

"The rights of John C. McKinney and of his estate are clear enough. The testator made it a condition of his gift of the stock to his children that they
3 D. & C.

should each give 2 per cent. thereof to McKinney, if he is willing to enter into the employ of the corporation. McKinney was in the employ of the testator during the latter's lifetime, and remained in the employ of the corporation until his own death on Dec. 31, 1922. He completely fulfilled the conditions upon which what was virtually a legacy was given to him, and his executors are entitled to the stock, subject to the provisions of the will in reference thereto.

"I am, therefore, of the opinion that the one-sixth of the stock of Allen, Lane & Scott, representing the share of Martha S. Wells remaining undistributed in the hands of the accountant, should be awarded to G. Harlan Wells, executor of her will, subject to the conditions imposed by the testator, as above recited."

*Maurice Bower Saul* and *R. M. Remick* (of *Saul, Ewing, Remick & Saul*), for exceptant.

*E. Stanley Richardson* and *John Blakeley* (of *Middleton, Blakeley & Richardson*), contra.

THOMPSON, J., July 20, 1923.—We have read the clear and convincing opinion of the auditing judge and the testimony, and, as we agree with his findings of fact and conclusions of law, nothing further need be said other than to emphasize the fact that the testimony shows the executors never decided not to form a corporation, and, in this connection, the closing of the books on June 30, 1922, contrary to their usual custom, is most significant.

All the exceptions filed are, therefore, dismissed and the adjudication is confirmed absolutely.